1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

PETER OLNEY, et al.                                    Case No.  1:12-cv-01724-LJO-SKO

          Plaintiffs,

   v.                                                 **ORDER GRANTING DEFENDANTS'**
                                    **MOTIONS FOR SANCTIONS**

JOB.COM, et al.,                                       (Doc. Nos. 157, 158)

          Defendants.
_____/

## I.   INTRODUCTION

On July 26, 2014, Defendants Job.com, Inc. ("Job.com") and Windy City Call Center, LLC ("Windy City") (collectively, "Defendants") filed motions for sanctions against Plaintiff for spoliation of evidence during the course of discovery.  (Docs. 157, 158.)  Plaintiff filed briefs in opposition to both motions (Docs. 164, 165), and Defendants filed reply briefs on August 6, 2014.  (Docs. 168, 169.)  Plaintiff filed objections to each reply brief on August 7, 2014.  (Docs. 170, 171.)  A hearing was held on September 24, 2014; Jason Ibey, Esq., and Robert Hyde, Esq., appeared on behalf of Plaintiff; Hugh McCabe, Esq., Dan Bitterlin, Esq., appeared on behalf of Job.com; Fred Puglisi, Esq., appeared on behalf of Windy City.

For the reasons set forth below, Defendants' motions for spoliation sanctions in the form of dismissal is DENIED; Defendants' alternative motion for an adverse jury inference is GRANTED;

1  and Defendants' motion for monetary sanctions is GRANTED.

2  ## II.    BACKGROUND

3  **A.    Factual Background[1]**

On August 12, 2012, Plaintiff registered his resume with a website called "Resume-Now" as part of his efforts to seek new employment.   Resume-Now is owned and operated by LiveCareer, Inc. ("LiveCareer").   Registration with Resume-Now generally consists of three steps. First, the registrant is prompted to create or upload a new resume.   Second, the registrant is asked for information regarding the job he or she seeks.   Third, the registrant is asked to enter and confirm his or her email address.   According to Job.com, at this point the registrant also (1) is given an opportunity to review Resume-Now's terms of use and privacy policy; (2) is asked to acknowledge that he or she has read and agrees to the terms of use and privacy policy; and (3) is allowed to uncheck a box that reads:  "[R]ecive . . . free information on managing my career."

On August 13, 2012, Plaintiff used Resume-Now's resume posting service, a service that is offered only to subscribing members.   To initiate the resume posting service, Plaintiff clicked a button labeled:  "Post Resume.  Instantly post your resume to 90+ job boards."  Plaintiff was then directed to the resume posting splash page, where Plaintiff was given the option to choose from various categories of job-search websites where he wished his resume to be posted.  Plaintiff chose to post his resume on "General Sites."  Upon choosing "General Sites," Plaintiff was directed to a pop-up page displaying a list of additional job sites where his resume would be sent.  "Job.com" was one of the websites listed in the pop-up page.

As part of this process, Plaintiff was required to provide additional contact information. The website reads:  "Enter your mailing address and current phone [number] so that recruiters and potential employers can contact you."  Plaintiff entered his cell phone number on this page. Plaintiff was then given another chance to review Resume-Now's terms of use and privacy policy. Plaintiff reviewed the policy and completed the resume posting process by clicking "Post."

---

[1] This background section is taken from the district court's June 19, 2014, order on the third-parties' motions for judgment on the pleadings.  (Doc. 146.)

2

On August 17, 2012, Plaintiff registered an account with Job.com via Resume-Now's website. The registration process consisted of populating fields on five pages, one of which was the "Profile" page. On the Profile page, Plaintiff's cell phone number was entered in the "Home Phone" field. Job.com asserts that Plaintiff also left a box checked that read "[B]y keeping the box above checked, I'd like to be contacted by phone to discuss educational opportunities to help prepare me for my dream career." Although the box was checked by default, a registrant may uncheck the box if he or she wishes to opt out of the service. Plaintiff claims that he never visited Job.com, never saw the opt-out box, and therefore could not have checked it nor left it unchecked.

Job.com forwarded Plaintiff's profile, including his phone number, to a third party, Windy City. Windy City operates the Windy City Call Center, which is used to provide "education leads" to higher learning institutions. Job.com, through Windy City, placed multiple calls a day to Plaintiff on August 17, 2012, through September 4, 2012, for the purpose of selling Job.com and Windy City's or a third party's services.

Plaintiff filed this suit on October 19, 2012, on behalf of himself and all other similarly situated individuals. According to the currently operative Second Amended Complaint ("SAC"), Plaintiff seeks statutory damages and injunctive relief against Job.com and Windy City for negligent willful violations of the Telephone Consumer Protection Act ("TCPA").

**B.      Discovery and Procedural Background**

      **1.      Plaintiff's Deposition**

On October 4, 2013, Job.com deposed Plaintiff and asked him about his job search and job-related websites he visited at or around the time he paid to have his information provided to Job.com. Plaintiff was asked to identify the computer he used to perform his job search; Plaintiff indicated his home computer was used. Plaintiff was instructed not to "take any steps to delete any Web browsing history or any information from that computer and we may be requesting access to that through discovery."

      **2.      Job.com's Request for Production of Tangible Things**

On October 11, 2013, Job.com served Plaintiff with a second set of Request for Production of Tangible things which sought production of two items: (1) the cell phone Plaintiff alleges he

was called on in violation of the TCPA; and (2) the home computer Plaintiff testified at his deposition he used to conduct his job search.  Regarding Plaintiff's home computer, Job.com specifically indicated its examination would include "internet history, cookies, and temporary files related to Plaintiff's access and visitation of job-related websites" as well as "local electronic files pertaining to any and all emails related to Plaintiff's job search and access of job-related websites, including any attachments to those emails, and any and all resumes or cover letters."  (Doc. 158-7 Exhibit B.)   On November 19, 2013, Plaintiff objected to Job.com's request for production.  The parties engaged in a lengthy meet and confer process, and ultimately requested an informal discovery dispute conference with the Court, which was held on January 9, 2014.

**3.      Court Orders Plaintiff To Produce Computer to Neutral Expert**

On January 10, 2014, following an informal telephonic conference with the Court, Plaintiff was ordered to turn over his computer and phone to the parties' agreed-upon neutral expert for imaging by no later than January 14, 2014, which was extended by stipulation of the parties to January 17, 2014.   (Doc. 97.)   Plaintiff's computer was turned over to neutral expert BCT Consulting ("BCT") on Friday, January 17, 2014.  The results of BCT's initial investigation were produced on January 21, 2014.  (Doc. 158-17, Exhibit L.)

**4.      Neutral Expert's Reports**

BCT's report indicated the presence of a computer program called "Winclear" on Plaintiff's computer.  This program is used to delete internet history, cookies, and web files.  On February 19, 2014, the parties held a conference with Marshall Moll of BCT and requested further investigation of the Winclear program.   On February 21, 2014, Mr. Moll provided further investigation results which revealed the Winclear program was run only once on January 16, 2014, the day before Plaintiff turned over his computer for inspection.  (Doc. 158-17, Exhibit L.)

Plaintiff informed Job.com that Winclear was not run manually by Plaintiff, but had "popped up" on Plaintiff's computer.  The parties again contacted Mr. Moll at BCT to ask him to investigate the issue further in light of Plaintiff's explanation.

Mr. Moll responded to the parties on March 3, 2014, indicating it was "very unlikely" that the program ran on its own.  Mr. Moll also discovered two additional programs, PC Doctor and

PC Optimizer Pro, which were run on January 16, 2014, and January 17, 2014. Mr. Moll was asked to prepare a report, which Mr. Moll produced on April 1, 2014. (Doc. 158-20, Exhibit O.) Job.com's and Plaintiff's counsel met and conferred regarding Job.com's request to obtain its own expert to analyze Plaintiff's hard drive, but Plaintiff refused to stipulate to further expert examination of the computer data.

### 5.      Parties Permitted to Hire Experts to Evaluate Plaintiff's Computer Data

On May, 1, 2014, the parties appeared again for an informal telephonic discovery dispute conference. Following the conference, the Court issued a minute order permitting Job.com to retain its own expert to review a mirror image of Plaintiff's hard drive. (Doc. 124.)

### 6.      Job.com's Expert:  Global Digital Forensics, Inc.

Job.com retained forensic expert Global Digital Forensics, Inc. ("GDF") to inspect the image of Plaintiff's hard drive. On May 30, 2014, GDF provided a formal report of its findings. (Doc. 158-22, Exhibit Q.) GDF concluded that the computer clock setting had been intentionally manipulated to roll the computer date backwards to December 1999. The computer system event log showed four entries confirming the date change was a user-initiated action, not something the system did without intervention. (Doc. 158-22, Exh. Q, p. 5.) GDF also concluded that a program named PC Optimizer Pro was initially installed in November 2012, and re-installed on May 27, 2013. The program was set to run on a scheduled basis to destroy and remove data from the computer hard drive. The last time PC Optimizer was run, on January 17, 2014, 2,318 items were "cleaned" off the system. Between December 21, 2012, and December 28, 2013, a total of 15,686 files were purged from the system. (Doc. 158-22, Exh. Q, p. 5.) GDF summarized the Windows prefetch data in relevant part as follows:

> It is possible to determine the number of times a program has been used, and the last date it was run, by examining the metadata of the prefetch files.
>
> Based on the analysis of the extracted metadata [from Plaintiff's hard drive], the PC Optimizer program was run only once, on January 17, 2014. Since we know that the PC Optimizer program was used more than once, evidenced by the recovered log files, the only way the prefetch metadata could display a single use is that the prefetch files were deleted. Additional review of other program files listed in the prefetch folder also indicate single or very few runs. This condition would indicate

1    that multiple prefetch files were deleted.  Further analysis indicated that in excess
     of 70 prefetch files were created between January 12, 2014, and January 17, 2014
2    (see Exhibit #4 A and 4 B).

3    (Doc. 158-22, p. 10.)  GDF concluded the Winclear program was run on Plaintiff's computer and

4    detected 12,775 items on January 16, 2014.

5        **7.    Plaintiff's Expert:  Hansen Legal Technologies, Inc.**

6        Upon review of GDF's report, Plaintiff retained Jeffrey Hansen to review GDF's findings

7    and conduct another evaluation of Plaintiff's computer regarding the spoliation issue.  (Doc. 158-

8    25; 164-5.)

9        **a.    Date Manipulation Not Caused by Plaintiff**

10       Mr. Hansen's report indicates the data on Plaintiff's computer does not reflect that Plaintiff

11   manually  attempted  to  manipulate  the  date,  but  that  the  computer  system  was  "simply

12   synchronizing with the NTP server."  Any log entries showing a change in date was momentary

13   and showed only that Windows, Plaintiff's computer operating system, was synchronizing its time

14   with  an  NTP  server.    He  concluded  there  was  "<u>no</u> possibility  that  anything  other  than  a

15   synchronization with an NTP server created [the date change] event."  (Doc. 164-5, p. 8.)

16       **b.    PC Optimizer Program Ran Automatically**

17       GDP determined that the PC Optimizer program was set to run automatically every two

18   weeks,  three  times  a  week,  on  Tuesday,  Thursday,  and  Saturday  at  11  a.m.    Mr.  Hansen

19   determined that PC Optimizer was actually configured to run every Tuesday, Thursday, and every

20   other Saturday at 11:00 a.m.  Nevertheless, the data on the computer indicates the program was

21   last run on *Friday*, January 17, 2014.  Mr. Hansen asserts that when PC Optimizer is scheduled to

22   run and the time it actually runs can vary.  For example, Mr. Hansen notes PC Optimizer ran on

23   December 16, 2013, which was a Monday, and not a regularly scheduled scan day.  Mr. Hansen

24   states there are many reasons why the scheduled run of PC Optimizer could be delayed, such as

25   the computer being placed in sleep mode at the time of a scheduled run.  Mr. Hansen opines there

26   is no evidence to suggest that Plaintiff had any involvement with PC Optimizer being run on a day

27   other than when it was scheduled, and it ran on an unscheduled day because the computer was

28

6

1   sleeping or shut down on the day it was scheduled to run.  (Doc. 164-5, p. 12.)

2                    **c.       The Effect of Winclear is Disputed**

3           The version of Winclear on Plaintiff's computer was an unregistered version, and

4   Winclear's system summary shows that no items were removed on the previous scans.  According

5   to GDF, there was a registry in the Windows Operating system that tracked access to files in an

6   area known as "mru" or "Most Recently Used."   Within this registry key, there was direct

7   navigation and access to a Winclear log.  When the drive was searched, the log was identified in

8   the recycle bin, indicating it had been deleted by the user.  Mr. Hansen opines that Plaintiff did not

9   perform the deletion, but that PC Optimizer scanned that file, and the access time of the file was

10   changed.  PC Optimizer then sent the file to the recycle bin, and emptied the recycle bin.  (Doc.

11   164-5, p. 13.)  Mr. Hansen also notes the log shows when the file was created and deleted.  The

12   Winclear log file was sent to the recycle bin at 3:43 and 20.716999 seconds, and 0.007999 seconds

13   later the file was deleted.  Plaintiff could not have deleted the file, moved it to the recycle bin, and

14   emptied the bin all within 0.00799 seconds.  Moreover, PC Optimizer runs using the pmojjo2003

15   account on Plaintiff's computer.  Because GDF mistakenly assumed that Plaintiff was the only

16   user of that account, GDF pointed to this user account recorded in the log as additional evidence

17   that Plaintiff was manually directing the deletions of the Winclear scan.   In actuality, PC

18   Optimizer also runs under that account.  In sum, Mr. Hansen opines that only a software program

19   can access a file, delete it, and navigate to the recycle bin to empty it in 0.007999 seconds; PC

20   Optimizer can perform such a task, and would have done so under Plaintiff's user account

21   pmojjo2003.

22                    **d.       Deletion of Files by the Neutral Expert**

23           When comparing files deleted from the recycle bin, the MFT entries showed that files were

24   deleted on January 18, 2014, after Plaintiff turned his computer over to BCT.  This deletion

25   occurred before a "dd image" was made of the hard drive – i.e., "all forensic examinations done on

26   this drive . . . . , were done on an image in which log files and restore points that are at issue in this

27   case [were] modified, accessed, or deleted while in the custody of the neutral expert." (Doc. 164-

28   5, p. 18.)  Six items were deleted on January 18, 2014.  According to Mr. Hansen, the system was

1   not turned on after the last entry in the log files of January 17, 2014, yet the drive has time stamps

2   of January 18, 2014, spanning over a four-hour period showing 60 files being created, accessed,

3   modified, or deleted.   "This can only be done by booting a computer with a different operating

4   system than what is on the drive and accessing that drive."   Mr. Hansen opines that either the

5   neutral expert was not reliable or erased the data purposefully.  (Doc. 164-5, p. 20.)

6         **e.**     **Disc Defragmenter**

7       GDP noted that a disc defragmentation utility on Plaintiff's computer was scheduled to run

8   on Wednesdays, but the files show that the disc defragmenter also ran on Friday, January 17,

9   2014.   Mr. Hansen inspected the registry key and found there was no history of a scan on

10   Wednesday, January 15, 2014.   Mr. Hansen opines the history was deleted by PC Optimizer, and

11   when "Windows Defrag" detected there was no entry of a disc defragmentation on Wednesday,

12   January 15, 2014, it ran the disc defragmentation utility again on Friday, January 17, 2014.  (Doc.

13   164-5, p. 21.)

14         **f.**     **Internet Explorer and USB Devices**

15       Although GDF noted that Google Chrome's browser history was regularly purged, Mr.

16   Hansen opines this is not unexpected given that "this is what PC Optimizer Pro does."  (Doc. 164-

17   5, p. 22.)   GDF also opined that it was highly unlikely that the end user of the computer did not

18   use Internet Explorer during the past five years.   Mr. Hansen responds, however, that Google

19   Chrome browser was installed as the default browser and Internet Explorer would not be used

20   unless the user goes "out of his way to open Internet Explorer."   He opines that, given this

21   configuration, Internet Explorer is likely to have never been used (or seldom used) for however

22   long Google Chrome was installed on the computer.

23       GDF also noted that Plaintiff's Android phone was connected to his computer on January

24   15, 2014.   Mr. Hansen asserts many users connect their phones to a computer USB port to charge

25   the phone.   Although BCT found no email on the phone, Mr. Hansen asserts it failed to use the

26   proper imager to export files from an Android phone.

27

28

### g.      Conclusion

Mr. Hansen concludes that the deleted files mentioned by GDF in its report were not manually deleted by the user of Plaintiff's computer.  Mr. Hansen opines Plaintiff is a novice computer user, the neutral expert deleted or modified files which calls into question the integrity of any examination of the hard drive, and the web history and files were automatically deleted by PC Optimizer.  (Doc. 164-5, p. 23-24.)

### 8.      GDF's Supplemental Report

On July 26, 2014, GDF prepared a supplemental report to rebut the opinion of Mr. Hansen, which is summarized below.

### a.      Computer Proficiency of Plaintiff

GDF disagrees with Mr. Hansen's conclusion that Plaintiff is a novice computer user who did not possess the skill and understanding to use the wiping programs to delete internet history files.  GDF notes Plaintiff testified at his deposition he took introductory computer classes in college, he received training on multiple computer programs including SAP and CMMS, both of which GDF maintains require a level of expertise to program that would certainly not be considered novice.  (Doc. 164-4, p. 6.)  Plaintiff testified he could "spend an hour talking about computer training," and he demonstrated a good understanding of how resumes are processed by computers in the current job market.  He also referenced a "Cono system" and correctly described it as a cloud-based server, again indicative of his technical understanding of computer and internet "architecture" which a novice computer user would not grasp.  Plaintiff also made two separate purchases for a program called Winclear long before he claims he bought PC Optimizer to deal with "spam."  Plaintiff claimed to have been the victim of identity theft, which caused him to be cautious about submitting personal information through a website.  In light of this information, GDF opined it was unlikely Plaintiff would purchase, download, and install the PC Optimizer Pro knowing nothing about the program, especially after being an identity-theft victim and previously purchasing Winclear, which had a similar function.

9

### b.   Manipulation of Computer Clock

According to GDF, a change in the computer clock raises a red flag for a computer forensic expert.  (Doc. 164-4, p. 7.)  GDF specifically notes that files were created and deleted on January 18, 2014, the day after Plaintiff turned over his computer to BCT, and attributes this to the general date anomalies that appear on the system.  GDF maintains that the time changes were not part of the "normal" Windows time synchronization, as Mr. Hansen opined.  The time clock was changed under the user account "pmojjo2003-PC" by a third-party utility, and not the Windows Network Time Protocol ("NTP").  NTP changes to the system are normal and expected.  However, the time changes on Plaintiff's computer were unrelated to the Windows NTP service.  Specifically, Windows NTP does not change the time backwards, which is what happened here.  Instead, it synchronizes the computer time with the Network Time Server selected in the registry.  Plaintiff's computer included a program called PC Doctor for Windows, which tests the system and hardware as a health check, and manipulates the computer clock under the user account.  This program is a third-party utility and not a normal component of Windows operating system.  GDF opines that Mr. Hansen's statement regarding NTP and Epoch time simply does not apply in this case to explain the date anomalies.  Further, as it pertains to Mr. Hansen's claim that GDF's time clock was incorrectly set to Eastern Standard Time, GDF uses a commercial program that converts UTC to local file times and is independent of the examiner's system time clock.

GDF concludes that the computer clock "provided a number of anomalies on Plaintiff's computer and made its investigation very difficult.  GDF is unable to identify why the time and dates are failing.  However, when GDF analyzes Plaintiff's computer as a whole, we still opine Plaintiff most likely caused the date discrepancies."  (Doc. 164-4, p. 19.)

### c.   PC Optimizer's Deletion of Information

Despite the date anomalies on Plaintiff's computer, GDF maintains it was able to verify that PC Optimizer was last run at 5:16 a.m. on January 17, 2014, the day the computer was to be turned over to BCT.  GDF contends that PC Optimizer was manually configured by Plaintiff to run on a particular schedule, establishing that Plaintiff knew how to use the program and was able to direct the program's scan schedule.  The PC Optimizer scan started at 5:16 a.m. and was

1  cancelled at 5:21 a.m. by the user, establishing that Plaintiff was interacting with the program and

2  understood its functionality.  PC Optimizer deleted 2,318 files on January 17, 2014.

3              **d.      Winclear**

4       Plaintiff purchased Winclear in May 2008 and again in August 2009.  (Doc. 158-23, p. 12.)

5  The Winclear directory contains 2,000 files that were transferred onto Plaintiff's computer when

6  the program was installed.  Thus, GDF concludes that Plaintiff purchased the program, copied it to

7  his computer system, and installed it, contradicting Plaintiff's statement that Winclear simply

8  appeared on his computer.  GDF also opines that Winclear is not a program a novice computer

9  user would install.  Prominently displayed on Winclear screen is a definition of the program's

10 design:  "Winclear is an Internet history eraser that protects your Internet privacy by cleaning up

11 all tracks of your Internet and computer activity."  (Doc. 158-23, p. 13.)  Although Winclear did

12 not delete any items, there is no explanation why Winclear was run on January 17, 2014.  The

13 prefetch data shows that Winclear was installed on January 16, 2014, the scan results were saved

14 to a .txt file, and the file was opened and manually erased.

15             **e.      Windows Prefetch**

16      GDF opines that PC Optimizer does not delete files from the prefetch folder.  Thus,

17 deletion of the prefetch files would not have been automatically performed by PC Optimizer, as

18 Mr. Hansen claims.  Also, the prefetch files show that PC Optimizer ran only once.  Because the

19 data on the computer indicates PC Optimizer ran more often, the prefetch folder would only

20 indicate a single use if the prefetch files were deleted.  GDF's analysis indicates that in excess of

21 70 prefetch files were created between January 12, 2014, and January 17, 2014.  (Doc. 158-23, p.

22 14.)

23             **f.      Restore Points**

24      According to GDF, restore points on a computer allow users a choice to roll back to a

25 previous system state.  Restore points are created automatically by the Windows operating system

26 every 24 hours.  Here, there was only a single restore point on the system directory.  According to

27 GDF, the lack of restore points is suspicious.  Although Mr. Hansen claims PC Optimizer deleted

28 restore points, GDF maintains there is no evidence of this.  Rather, PC Optimizer prompts users to

create a restore point before making changes to the system.

### g.   Disc Defragmenter

Defragmenting a drive overwrites deleted data in free space to store data in a contiguous way to speed up access.  The end result is that data is overwritten.  Whether the program ran automatically or was manually run, it deleted data on the computer.

### h.   Internet Explorer

Although Mr. Hansen opines that Plaintiff simply did not use Internet Explorer, deleted files contain Internet Explorer records proving the Internet Explorer browser was used, including in January 2014.  Mr. Hansen identified 1,982 hits for the key word "job.com."  GDF confirms there were relevant entries indicating Plaintiff accessed the Job.com website, but because the data was deleted, there is no record of what he did at that website.

### i.   Deletion of Data by BCT

GDF reviewed the equipment used by BCT to mirror Plaintiff's hard drive, and confirmed with BCT that it did not delete any data.  GDF opines the date discrepancies on Plaintiff's computer are responsible for deletions that allegedly occurred on January 18, 2014.  BCT used industry standard technology for the mirror image, and no evidence of wrongdoing on BCT's part has been presented.

### j.   Conclusion

GDF notes even Mr. Hansen concedes that information was deleted from Plaintiff's computer.  The fragments of data recovered show that Plaintiff interacted with Job.com, which is information Defendants claim is relevant to their defenses.  The only dispute is whether Plaintiff's conduct in deleting evidence was willful.  GDF claims the evidence in its report is quite clear that Plaintiff's actions were willful and deliberate.  Moreover, the entire process could have been avoided if Plaintiff had used a competent expert to preserve the system data after being instructed to do so.

### 9.   Mr. Hansen's Supplemental Report

Plaintiff obtained a supplement report from Mr. Hansen to respond to GDF's supplemental report.  (Doc. 164-6.)  Mr. Hansen asserts that GDF took Plaintiff's deposition testimony out of

context, and Plaintiff's training on particular computer software does not establish he has computer programming abilities. Regarding the date irregularities, Mr. Hansen reaffirms his original statement that the system and its programs, not Plaintiff, were responsible for any time-change issues. As to PC Optimizer being reinstalled in May 2013, the program was probably replaced by a new one; even if it was re-installed, this is a very simple process and does not establish that Plaintiff had any exceptional knowledge of the program itself. Regarding PC Optimizer's scan being cancelled on January 17, 2014, users will routinely stop scans when they interfere with the processing speed of the computer. Also, if Plaintiff were truly attempting to delete data, he would not have *stopped* the scan. Winclear was purchased by Plaintiff in 2008, but Plaintiff allowed his license to expire, rendering the program unregistered. When unregistered, Winclear will run automatically but will not delete data. According to Mr. Hansen, "Winclear did not delete anything long before litigation began and to investigate it further would accomplish nothing." (Doc. 164-6, p. 20.) Neither Winclear nor PC Optimizer is a desirable program for an advanced computer user.

Mr. Hansen also contends that the prefetch folder was actually deleted by Windows itself. Windows only allows 128 files in the prefetch folder, and anything beyond that is automatically deleted. As to restore points, because Plaintiff's computer is old, it can only hold a certain number of restore points. The disc defragmentation program was run automatically. Regarding Internet Explorer, Mr. Hansen explains he never stated Plaintiff did not use the browser, but that Plaintiff may simply not have used it in lieu of Google Chrome. Finally, Mr. Hansen reiterates that BCT did delete data on January 18, 2014, as evidenced by "hash values."

**10.      GDF's Supplemental Report and BCT's Responsive Declaration Will Not Be Considered**

Job.com and Windy City each attached to their reply briefs a second supplemental report prepared by GDF on August 6, 2014. Plaintiff objects to this supplemental report because it was filed with a reply brief, and Plaintiff was not given an adequate opportunity to respond.

The Court declines to consider this supplemental report because it is merely a rebuttal of Mr. Hansen's supplemental report. Rebuttal expert reports are potentially endless in this

1  circumstance, and declining to consider the additional expert report attached to the reply brief

2  avoids a Kafkaesque supplemental report problem.  The Court also held a two-hour hearing on

3  September 24, 2014, and the parties were given ample time, along with their experts who each

4  appeared telephonically, to respond to any argument or issue raised in the briefs or reports.  As

5  such, the supplemental expert report attached to Defendants' reply briefs will not be entertained.

6       BCT filed a statement with the Court refuting Mr. Hansen's allegations that it deleted any

7  data in the mirror imaging of Plaintiff's computer.  (Doc. 184.)  Neither this statement, nor the

8  declaration attached to Defendants' reply briefs were considered for purposes of this decision.

9  **III.   PARTIES' ARGUMENTS**

10       Job.com and Windy City each filed motions for sanctions, seeking dismissal of Plaintiff's

11  complaint.[2]  Defendants argue that Plaintiff's conduct in allowing file deletion programs to run on

12  his computer during the course of the litigation after the duty to preserve was triggered amounted

13  to a willful and deliberate destruction of relevant computer data.  Defendants assert the destruction

14  of computer data was so substantial, no sanction less than dismissal will address the harm.

15  Alternatively, both Defendants seek an adverse inference jury instruction.  Finally, Defendants

16  seek monetary sanctions against Plaintiff for the fees and costs associated with their motions.

17       Plaintiff claims he had no notice that his computer data was relevant to the litigation before

18  his October 2013 deposition.  Because he had installed deletion programs on his computer years

19  before the lawsuit and before the duty to preserve was triggered, all data possibly relevant to this

20  litigation was deleted long before his October 2013 deposition.  Further, Plaintiff did not make any

21  deliberate attempts to manually delete data on his computer, particularly after the Court ordered

22  production of the hard drive.  As no relevant data was destroyed at a time when the duty to

23  preserve was triggered, no sanctions are warranted.  Further, even if sanctions were appropriate,

24  the best remedy would be to require Plaintiff to pay to have its expert recover the deleted data.

25

26

27

28  [2] The motions are nearly identical; they seek the same relief on the same grounds.  As such, the Court considers them in tandem.

## IV.   DISCUSSION

**A.      Plaintiff Spoliated Relevant Evidence**

The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation. *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). Once the duty to preserve evidence arises, a party must "suspend any existing policies related to deleting or destroying files and preserve all relevant documents relating to the litigation." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006). Spoliation results from "the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). In addition to showing a party destroyed evidence after the duty to preserve was triggered, it must also be shown that the party acted with a culpable state of mind. In other words, prior to imposing any sanction, the court must make a finding of fault. Therefore, to determine whether spoliation has occurred, the Court must consider (1) when Plaintiff's duty to preserve evidence was triggered; (2) whether relevant evidence was destroyed or altered by Plaintiff after the duty was triggered; and (3) whether Plaintiff acted with a culpable state of mind in destroying or altering relevant evidence. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

### 1.      Plaintiff had a Duty to Preserve Computer Data By August 2012

Plaintiff contends he had no basis to reasonably understand or know, before his deposition, that *any* of the data on his computer was even potentially relevant to the litigation. This litigation is about telephone calls under the TCPA, and there was no reason for Plaintiff to understand it would have anything to do with his computer. The earliest any duty to preserve evidence would have arisen was at Plaintiff's deposition on October 4, 2013, when he was instructed by Defendants' counsel to save data on his computer.

Defendants argue the phone calls at issue here arise out of Plaintiff's computer job search activities during which he provided his phone number and consented to telephone contact by Defendants. Plaintiff was informed during one of these calls at issue that Job.com had obtained

his number.   According to Defendants, by virtue of Job.com's name, it is obviously an internet company that has something to do with jobs.   The link between the calls and Plaintiff's online job search should have been reasonably apparent.   At the time he contemplated his lawsuit, Plaintiff should have known his computer job-search activities could be potentially relevant to the litigation.

Litigants have an obligation to preserve potentially relevant evidence from the moment that litigation is reasonably anticipated.   But a party only engages in spoliation as a matter of law if it had some notice that the evidence was at least potentially relevant to the litigation before it was destroyed.   *Kitsap Physicians Serv*., 314 F.3d at 1001.

Plaintiff's assertion that the duty to preserve his computer data did not arise until his October 2013 deposition is unpersuasive.   As Defendants note, the calls at issue arise out of Plaintiff's *online* job search, which was conducted through use of his home computer.   When Plaintiff had telephone contact with Windy City in August 2012, he discovered his cellular telephone number was obtained through Job.com, an internet company against whom Plaintiff filed suit approximately 6 weeks later.   As Defendant notes, Job.com's name itself indicates it is an internet company and implies it has something to do with jobs.   Given that Plaintiff was contemporaneously conducting an online job search, Plaintiff should reasonably have been aware that the phone call arose out of his online job-search activities.   While Plaintiff may not have had actual knowledge how data on his computer related to his job search would be used by Defendants, he should have known that his online job search activities on his home computer were at least potentially relevant to the litigation.

Moreover, Plaintiff retained experienced class-action counsel with three law firms who should have known his computer could contain potentially relevant information.   *See Surowiec v. Capital Title Agency, Inc*., 790 F. Supp. 2d 997, 1006 (D. Ariz. 2011) ("The preservation obligation runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." (quoting *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 290 (S.D.N.Y. 2009))).   The link between the complained-of phone calls and Plaintiff's online job search was reasonably clear at the

time Plaintiff contemplated his suit in August 2012.[3]  Because Plaintiff knew his online job search was conducted on his home computer, he was on notice that his computer may contain potentially relevant evidence in his action against Job.com.

Even if the potential relevance of his computer data was not reasonably known at the time the lawsuit was contemplated, the duty to preserve Plaintiff's computer data, particularly anything related to his job-search activities, became apparent in July 2013 when Defendants requested a list of each and every website Plaintiff accessed for purposes of posting his resume.  Additionally, Plaintiff was specifically instructed at his October 2013 deposition to preserve data on his computer.  Finally, in January 2014, Plaintiff was ordered to turn over his computer for examination for relevant evidence.  It is not disputed that Plaintiff had installed Optimizer Pro in November 2012 and this program deleted internet history and files from its installation until the computer was turned over to the parties' neutral expert in January 2014.

Although Plaintiff contends he had no reason to make a connection between the litigation and data on his computer in August 2012, as the litigation progressed, Plaintiff was presented with specific indicators that his computer data was relevant to Defendants' defenses. What should have been *reasonably known* to Plaintiff at the time he contemplated his lawsuit about the relevance of data on his computer bloomed into *actual knowledge* by his October 2013 deposition.  In sum, data on Plaintiff's computer was deleted after the duty to preserve it was triggered in August 2012. The next question is whether any of the destroyed data was relevant.

**2.     Plaintiff Destroyed Relevant Computer Data**

Plaintiff argues that, even if the duty to preserve evidence on his computer was triggered as early as August 2012, deletion programs on his computer were continuously running and would have deleted relevant information before the duty was triggered.  In other words, by the time any duty to preserve attached, all potentially relevant information would already have been deleted. Plaintiff also contends that nothing he did on his computer *after* the August 2012 phone calls were received could be considered relevant to Job.com's defenses.

---

[3] Plaintiff stated at his deposition that he consulted with his attorney days after receiving his first telephone calls from Defendants.  (Doc. 158-6, Exhibit A, Olney Depo., 174:14-20.)

Defendants assert Plaintiff's online job search activities, even those searches after the phone calls from Windy City, potentially contain circumstantial evidence as to the scope of Plaintiff's consent to receive phone calls about educational opportunities.  Defendants assert that the scope of Plaintiff's consent remains a factual issue in the litigation.[4]

Plaintiff's argument rests on two premises:  first, nothing Plaintiff did on his computer *after* the phone calls with Windy City is relevant to the issue of consent so any deletions after August 2012 would not have involved any relevant evidence; and second, even if post-call online activity were relevant to Defendants' defenses, this data was subject to continual deletion by wiping programs installed on the computer and therefore any relevant evidence would have been deleted by the time any duty to preserve arose.

Plaintiff's arguments are not persuasive.  The parties dispute whether computer data *after* Plaintiff's phone calls with Windy City could establish the scope of Plaintiff's consent.  Plaintiff contends consent under the TCPA cannot be implied and must be given *prior* to the call. Defendants argue the scope of Plaintiff's consent to the telephone contact by Windy City may be established implicitly and circumstantially by demonstrating Plaintiff's interest in educational opportunities – which was the subject of the calls.  Defendants also maintain that that post-call computer data gives rise to an inference regarding Plaintiff's scope of consent.  For example, Plaintiff's search for educational opportunities when he agreed to be called is relevant to establishing the scope of his consent to be called about educational opportunities. Notwithstanding the merits of Defendants' scope-of-consent defense, they are entitled to discovery and to present evidence relevant to that defense.  Plaintiff is not entitled to pre-judge Defendants' defense as lacking merit and then refuse to provide discovery based on that determination.

---

[4] In its order on Job.com's motion for summary judgment, the district court held that an individual may *indirectly* provide a third party with express consent to be called under the TCPA. (Doc. 122, 9:28-10:1.)  The Court determined it was "undisputed that Plaintiff provided his cell phone number to Defendant to be contacted about potential **employment** opportunities."  Defendants argued that Plaintiff's express prior consent to be called about **employment** opportunities also extended to being called about **educational** opportunities when he provided his cell phone number to Resume-Now.  Plaintiff asserted that he provided Defendant prior express consent only to discuss **employment** opportunities, and **educational** opportunities are different from **employment** opportunities.  The Court determined that "[i]t may be true that potential opportunities that Windy City was offering could have helped Plaintiff's employment prospects; however, it is equally possible that the opportunities were wholly irrelevant to Plaintiff's employment goals.  The Court therefore finds that genuine issues of material fact exist as to whether the scope of Plaintiff's express consent extended to Windy City's calls regarding educational opportunities." (Doc. 122, 11:10-15.)

Moreover, "relevance" as it pertains to discovery is defined broadly.  *Garneau v. City of Seattle*, 147 F.3d 802, 812 (9th Cir. 1998).  For discovery purposes, relevance means only that the materials sought are reasonably calculated to lead to the discovery of admissible evidence.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  Here, Defendants have a right to present their chosen defenses and to collect discovery relevant to that defense -- they have adequately established the relevance of the data they sought on Plaintiff's computer and its nexus to their defense.

Plaintiff's second premise – that all relevant data on his computer *before* the calls with Windy City would necessarily have been deleted long before the duty to preserve the data arose – is also flawed.  First, Plaintiff confirmed at the hearing there is no evidence that Winclear was deleting information in 2012.  As Plaintiff's expert noted in his reports, Plaintiff purchased Winclear program licenses in 2008 and 2009 which lapsed, and there is no evidence Winclear was actually deleting any data on Plaintiff's computer in any relevant period during 2012.[5]   Plaintiff did not install Optimizer Pro until November 2012; therefore, even pre-call computer data was still ostensibly in existence at the time the duty to preserve arose.  Second, Defendants' expert found some website history data on Plaintiff's computer from July 2012 indicating Plaintiff visited Job.com's website prior to the lawsuit;[6] had Plaintiff taken steps to preserve the data at an earlier time, there may have been more content that escaped being wiped from the computer.  Plaintiff's argument that all the relevant data was deleted *before* a duty to preserve was triggered is self-serving and not corroborated by the data recovered by Defendants' expert.  In sum, relevant computer data was destroyed by Plaintiff after a duty to preserve was triggered.

### 3.     Plaintiff Acted with A Culpable State of Mind

The Court must next consider Plaintiff's degree of culpability in the destruction of the computer data.  At a minimum, the culpable state of mind is negligence.  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (simple notice of potential relevance to litigation is sufficient to

---

[5] The parties dispute whether an unregistered version of Winclear was run by Plaintiff in January 2014.  However, Plaintiff's expert indicates the license for Winclear lapsed after 2009, and the unregistered version of the program was not capable of actually deleting any information.  (*See* Jeff Hansen Report, Doc. 164-6, p. 20.)

[6] *See* Doc. 158-23, p. 17 (ECF pagination); Doc. 158-4, Ozura Decl., ¶ 5.

impose sanctions for spoliation); *see also Unigard Sec. Ins. Co. v. Lakewood Eng'r & Mfg. Corp.*, 982 F.2d 363, 368-69, n.2 (9th Cir. 1992) (negligent destruction of evidence is sufficient to warrant a sanction excluding evidence).

A significant portion of the parties' expert reports and briefs is devoted to Plaintiff's degree of culpability in installing the file deletion programs and allowing them to run after the duty to preserve evidence arose.  Plaintiff's expert opines that Plaintiff is a novice computer user who had no idea how Winclear or PC Optimizer functioned.  Defendants' expert opines that, based on Plaintiff's deposition testimony, he has substantial computer knowledge and the evidence strongly suggests he manually ran PC Optimizer on January 17, 2014 – the day he turned his computer over to BCT – to delete information on his computer, thereby preventing the expert from reviewing it.

Plaintiff's conduct meets the minimum culpability threshold in several regards.  Plaintiff's installation of PC Optimizer in November 2012 was at least negligent.  Even though the duty to preserve computer data, particularly internet data, should have been known to Plaintiff when he contemplated his lawsuit in August 2012, neither he nor his attorneys took any steps to mirror image Plaintiff's hard drive at that time or at any time after the lawsuit was filed in October 2012. Plaintiff installed PC Optimizer in November 2012, only one month after filing his lawsuit. Although Plaintiff's brief indicates he had no idea what PC Optimizer did, and he informed his expert, Mr. Hansen, Plaintiff did not understand the purpose of the program, Plaintiff's declaration carefully avoids any unequivocal statement that he did not know that PC Optimizer was a file-deletion program.  It has not been established that Plaintiff knew that PC Optimizer would delete internet history relevant to the litigation and installed it for that purpose.  Plaintiff's deposition testimony indicates, however, that he had enough computer knowledge to understand that PC Optimizer would delete files on his computer.  In light of the pending litigation, Plaintiff should have ascertained the precise nature PC Optimizer's deletion function *before* it was installed.  The failure to take steps to do so was negligence.

In July 2013, Defendants served discovery requiring Plaintiff to identify all websites where he posted his resume, which further implicated the relevance of Plaintiff's use of his computer

during his job search as a likely source of potentially relevant evidence to Defendants' defenses. Yet, neither Plaintiff nor his counsel made an attempt to mirror image the hard drive or confirm whether evidence on the computer was being preserved.

At Plaintiff's October 2013 deposition, he and his attorneys were expressly directed by Job.com's counsel to preserve internet history on Plaintiff's computer, but no steps were taken to do so. Job.com sought production of Plaintiff's computer data through formal discovery later in October 2013, and even at this point no steps were taken by Plaintiff or the three law firms representing him to either mirror image the computer or ascertain whether data on the computer was being preserved.

Finally, Plaintiff was ordered to turn over his computer on January 10, 2014, and again neither Plaintiff nor his counsel took any steps to ascertain whether computer data was being preserved.

In sum, Plaintiff was *negligent* with regard to the installation of PC Optimizer in November 2012 and its routine deletions of data after installation; he was *grossly negligent* in failing to take any steps whatsoever to preserve his computer data after Defendants' counsel instructed him at his October 2013 deposition to preserve his computer data; and, as discussed below, Plaintiff's failure to preserve evidence after the court ordered production of his computer hard drive constituted *willful and deliberate* spoliation.

### 4.    Conclusion:  Spoliation Sanctions are Warranted

As Plaintiff destroyed relevant evidence at a time when the duty to preserve had been triggered, and because Plaintiff acted with more than the minimum degree of culpability, sanctions are warranted. The Court next considers an appropriate sanction.

### B.    Form of the Appropriate Sanction

Defendants seek terminating sanctions, asserting that Plaintiff's conduct in deleting computer data was purposeful and deliberate. In the alternative, Defendants seek an adverse jury instruction. Defendants also seek monetary sanctions.

### 1.    Legal Standard

"There are two sources of authority under which a district court can sanction a party who has despoiled evidence:  the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who 'fails to obey an order to provide or permit discovery.'"  *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006) (quoting *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337-38 (9th Cir. 1985)).

A trial court's discretion in selecting the form of a spoliation sanction is broad, and can range from comparatively minor sanctions, such as awarding attorneys' fees, to more severe sanctions, such as dismissal.  The Court's discretion is not unlimited, and it must weigh several factors when deciding what type of sanction should be imposed on a party who despoiled evidence.  The remedy crafted should achieve the following:  (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been absent the wrongful destruction of evidence by the opposing party.  *Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1136 (N.D. Cal. 2012) (internal quotation marks and citation omitted), as modified in *Apple Inc. v. Samsung Elec. Co., Ltd.*, 888 F. Supp. 2d 976, 1000 (N.D. Cal. 2012) ("*Apple, Inc. II*").

Federal courts also have authority to sanction a party who "fails to obey an order to provide or permit discovery" under Federal Rule of Civil Procedure 37(b)(2)(A).  *Leon v. IDX Sys. Corp*., 464 F.3d 951, 958 (9th Cir. 2006).  Federal Rule 37 provides that where a party fails to comply with a court order, a court may issue any just order for sanctions, including the following: (1) direct that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (2) prohibit the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (3) striking pleadings in whole or in part; (4) staying further proceedings until the order is obeyed; (5) dismissing the action or proceeding in whole or in part; (6) rendering a default judgment against the disobedient party; or (7) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.  Fed. R. Civ. P. 37(b)(2)(A).

In crafting the appropriate sanction, courts must choose the least onerous sanction corresponding to the willfulness of the destructive actions and the prejudice suffered by the victim. *Apple Inc., II*, 888 F. Supp. 2d at 992.  The remedy should serve "the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  *West*, 167 F.3d at 779.

### 2.      Terminating Sanctions Are Not Warranted

Defendants argue that dismissal is the appropriate sanction.  According to Defendants, the five-factor test applied by the Ninth Circuit in *Leon* favors dismissal.  Defendants contend Plaintiff's refusal to produce his computer data required extensive meet and confer efforts that resulted in a discovery production order.  Once Plaintiff's computer was produced, it was discovered Plaintiff had deletion programs that had destroyed relevant data.  Defendants assert Plaintiff's extended refusal to produce his computer was an attempt to buy more time to purge files from his computer.  (Doc. 158-1, 17:14-18.)  Defendants also assert severe prejudice resulted from the deletions of data because, as noted by the court in *Leon*, Defendants have no way to know what might have been stored on Plaintiff's computer and no way of recreating it.  Defendants' experts identified thousands of files that were deleted from Plaintiff's computer since the lawsuit was filed.  Data from the websites Plaintiff visited during his job search and any materials he may have downloaded are relevant to the issue of consent.  Defendants argue a lesser sanction would force them to go to trial with less than complete evidence, would reward Plaintiff for his behavior, and would not deter future litigants.

Dismissal or default is an appropriate sanction when "a party has engaged deliberately in deceptive practices that undermine the integrity of the judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."  *Anheuser-Busch, Inc. v. Nat'l Beverage Distrib.*, 69 F.3d 337, 348 (9th Cir. 1995).  Before imposing this harsh sanction, however, district courts should consider the following factors:   "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."   *Leon*, 464 F.3d at 958 (quoting

*Anheuser-Busch*, 69 F.3d at 348).   While the court is not required to make explicit findings regarding each of the factors, dismissal is only proper if a finding of "willfulness, fault, or bad faith" has been found.  *Anheuser-Busch*, 69 F.3d at 348.  The district court must also consider less severe alternative sanctions rather than outright dismissal.

Here, the interests of expeditious resolution of the litigation have not been thwarted by Plaintiff's conduct.  While the file-deletion programs have created a considerable discovery issue, the litigation has not been unnecessarily protracted.  Even if this discovery dispute had not arisen, other motions remained pending such that the parties were not ready to move into class discovery sooner.  Second, management of the Court's docket has not been disrupted – a trial date has not yet been set and therefore the schedule has not required modification.  While the Court has invested significant time and resources into the parties' discovery dispute, it has not unduly impacted what is already a very congested docket.   Although the deletions have prejudiced Defendants in presenting a full defense on their scope-of-consent defense, an adverse jury inference is an alternative, less severe sanction that will adequately address Defendants' harm.  *Leon*, 464 F.3d at 958 (district court must consider "less severe alternatives" than outright dismissal).   Given the existence of a curative and lesser sanction, dismissal is not warranted.

### 3.    An Adverse Jury Inference is an Appropriate Sanction

As an alternative to terminating sanctions, Defendants seek the imposition of an adverse jury inference instruction.  The imposition of an adverse inference sanction is based on evidentiary and policy rationales that seek to deter a party who has notice of an item's potential relevance to the litigation from destroying it.  A finding of bad faith is not required – even a finding of simple negligence will suffice to support an adverse inference sanction.  *Glover*, 6 F.3d at 1329.

Because an adverse inference sanction may be imposed with the minimum level of culpability for the imposition of sanctions, the elements are the same as the threshold for imposing any spoliation sanction:  (1) the spoliating party had an obligation to preserve the evidence; (2) the evidence was destroyed or significantly altered with a culpable state of mind; and (3) the evidence was relevant to the other party's claim in that a reasonable trier of fact could find that it would support that claim.   Courts have recognized, however, that adverse inference sanctions are

nonetheless a harsh remedy.  *See, e.g., Apple II*, 888 F. Supp. 2d at 993-994 (adverse jury inference is a severe sanction that should not be given lightly).  If the degree of culpability of the spoliating party is not high, the prejudice to the non-spoliating party generally must be greater to warrant this sanction.  *See id.* at 992 (court should consider *both* degree of culpability of spoliater and prejudice to non-spoliater in fashioning sanction).

### a.      Plaintiff's Duty to Preserve Computer Data Was Triggered in August 2012

As discussed above, the duty to preserve Plaintiff's computer data was triggered when Plaintiff consulted his attorneys regarding his claims in August 2012.  *Kitsap Physicians Serv.*, 314 F.3d at 1001; *Graham v. Teledyne-Continental Motors*, 805 F. 2d 1386, 1390 n.9 (9th Cir. 1987) (citing *Bowmar Instrument Corp. v. Texas Instruments, Inc.,* 25 Fed. R. Serv. 423, 427 (N.D. Ind. 1977) for the proposition that sanctions are appropriate where the spoliating party should have known it would be relevant in future litigation).  Due to Job.com's obvious identity as an internet company having to do with employment, Plaintiff's online job search, and information that Job.com was responsible for the phone calls at issue, the link between the litigation and Plaintiff's computer data should have been reasonably known by Plaintiff and his counsel when they contemplated filing suit in August 2012.   Plaintiff acted negligently by installing PC Optimizer in November 2012, one month after the complaint was filed, which undisputedly deleted Plaintiff's internet history and other computer data Defendants seek to discover.

Moreover, even if the duty to preserve evidence was not triggered in August 2012 or at the time the suit was filed in October 2012, Plaintiff was instructed not to delete his computer data at his deposition in October 2013.  Thus, at the very *latest*, Plaintiff's duty to preserve his computer data attached on that date.

### b.      Plaintiff Destroyed Relevant Computer Data

Plaintiff confirmed at the hearing on September 24, 2014, that there is no evidence Winclear was deleting data on Plaintiff's computer in 2012.  While Plaintiff purchased Winclear licenses in 2008 and 2009, those licenses had lapsed and he apparently had only an unregistered version of Winclear on his computer in 2012, which was not capable of data deletion.  PC

1  Optimizer was not installed until November 2012, one month after the lawsuit was filed.  Thus,

2  Plaintiff's assertion that anything relevant would have been deleted long before the suit was filed is

3  incorrect.

4          Plaintiff disputes the legal merits of Defendants' scope-of-consent defense and whether

5  Plaintiff's internet searches could show the scope of Plaintiff's consent to receive calls about

6  educational opportunities.  This dispute as to the merits of Defendants' scope-of-consent defense

7  does not preclude Defendants from conducting discovery in support of their defenses.  Defendants

8  cannot be held to a particularly strict standard for showing relevance because the evidence was

9  destroyed by Plaintiff.  Defendants contend Plaintiff consented to the calls at issue by providing

10  his phone number to Resume-Now, the nature or scope of the calls to which Plaintiff consented

11  remains a factual issue in dispute.  For purposes of consent to Job.com's terms and conditions and

12  opting-in or out of telephone calls, Plaintiff states that he cannot recall visiting Job.com's website,

13  and Job.com can refute Plaintiff's assertion only by examining Plaintiff's computer website history

14  – which has, in large measure, been deleted.  Thus, Defendants have articulated how the destroyed

15  evidence would have been helpful to proving their claims and have established its relevance.  *See*

16  *Pension Committee of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 685 F. Supp. 2d

17  456, 467 (S.D.N.Y. 2010) (innocent party must show that the evidence would have been helpful in

18  proving its claims or defenses), *abrogated by Chin v. Port Authority of New York & New Jersey*,

19  685 F.3d 135 (2d Cir. 2012) (holding agency failure to institute litigation hold regarding certain

20  evidence did not constitute gross negligence per se).

21          Even if the duty to preserve did not arise until October 2013, Plaintiff has failed to show

22  relevant information was not deleted after that time.  Plaintiff argues only that PC Optimizer

23  would have deleted any relevant evidence long before that time.  Yet, Defendants' experts

24  recovered fragments of internet history from July 2012.  Had PC Optimizer been uninstalled as of

25  Plaintiff's October 2013 deposition, it is likely that more relevant evidence would have been

26  preserved.  As Plaintiff deleted his computer data, it is impossible for Defendants to prove *when*

27  and *what* was deleted.  Plaintiff is not entitled to a presumption that the destroyed evidence was

28  *not* relevant or that anything relevant *must* have been destroyed during an earlier deletion purge by

1   PC Optimizer.  *Leon*, 464 F.3d at 959 ("Moreover, because the relevance of . . . [destroyed]

2   documents cannot be clearly ascertained because the documents no longer exist, a party can hardly

3   assert any presumption of irrelevance as to the destroyed documents." (quoting *Alexander v. Nat'l*

4   *Farmer's Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982))).

5                     **c.      Plaintiff's Spoliation Was Deliberate and Willful**

6          While Plaintiff's failure to preserve data prior to being instructed to do so in October 2013

7   was grossly negligent, according to Defendants, Plaintiff took additional measures to delete data

8   after the Court's order to turn over his hard drive for mirror imaging and forensic examination.

9   According to GDF, on January 16, 2014, Plaintiff re-installed a non-registered version of Winclear

10  already existing on his machine; on January 17, 2014, Plaintiff opened the Winclear log, deleted

11  its contents, saved the empty log, deleted the .txt Winclear to the recycle bin, and then emptied the

12  recycle bin.  (Doc. 158-3, Carruso Decl. ¶ 14.)  GDF also indicates that "an unusual amount of

13  activity" took place on Plaintiff's computer starting on January 10, 2014, regarding deletions of

14  data and reconfiguration of his computer.  GDP opines that PC Optimizer was run by the user on

15  January 16, 2014, and deleted 2,318 files before the scan was cancelled, Plaintiff's disk

16  defragmenter was run on January 15, 2014, and January 17, 2014, and Chrome Internet browser

17  history was deleted on January 17, 2014.

18         Plaintiff's degree of culpability is quite high.  First, the degree of deletion activity in the

19  week following the Court's order that Plaintiff's computer be turned over to a neutral expert is

20  suspect.  A disc defragmentation was performed on January 15, 2014, and again on January 17,

21  2014.  The Winclear program was initiated to scan the computer, its scan was deleted, and PC

22  Optimizer ran on an unscheduled date and time.

23         Second, and more importantly, even if PC Optimizer is responsible for the bulk of the

24  deletions, Plaintiff installed that program and willfully allowed it to continue to delete data.

25  Plaintiff's conduct in installing PC Optimizer after the duty to preserve was triggered in August

26  2012 and allowing it to continue to run during the course of the litigation even after he was

27  ordered on January 10, 2014, to turn his computer hard drive over to an expert for imaging was

28  deliberate and willful.  The parties' experts understandably dedicate a great portion of their reports

1    debating explanations for how the deletions on January 16 and 17, 2014, occurred.   But

2    notwithstanding the lengthy explanations, hypotheses, and technical jargon, the following remains

3    undisputed: (1) Plaintiff *purchased* file deletion programs for his computer – they did not appear

4    by virus; (2) Plaintiff installed both deletion programs; (3) Plaintiff installed PC Optimizer in

5    November 2012 after *researching* the program; and (4) Plaintiff allowed deletion programs to run

6    on his computer even after being admonished to save his computer data and after the court ordered

7    that his computer be turned over for mirror imaging.   Allowing these programs to continue

8    deleting data was *deliberate and willful conduct*.   While it is not conclusive as to Plaintiff's

9    subjective intent, i.e., whether he had a bad-faith intent to disrupt the litigation and prevent

10   Defendants from obtaining relevant evidence, Plaintiff was aware that he was deleting his

11   computer data and was willful and deliberate in failing to uninstall these programs or take any

12   affirmative steps to preserve his computer data.   The ostrich did not bury its head in the sand by

13   accident.

14          Although Plaintiff suggests[7] he never knew or understood the real function of either of

15   these deletion programs, his conduct belies that assertion.   Plaintiff purchased two licenses for

16   Winclear in 2008 and 2009; he purchased a license for PC Optimizer in November 2012 after

17   researching the program and took affirmative steps to install these programs on his computer.   The

18   Court finds it implausible that Plaintiff would repeatedly purchase licenses for computer data

19   deletion programs of a similar type over a course of years, conduct computer research about PC

20   Optimizer, install these programs, and allow them to run over a large span of time yet not

21   understand what the programs did or how they functioned.   Notably, Plaintiff's declaration stops

22   short of an unequivocal statement that he did not know that the programs deleted data.   Rather, he

23   states he believed the programs could enhance the performance of his computer and could help

24   with "such things as spam, unwanted programs and damaged/corrupt files."  (Doc. 164-10, Olney

25   Decl., ¶¶ 19-20.)

26          In the face of Plaintiff's deposition testimony, Plaintiff's suggestion he did not know these

27

28   _____

[7] The Court notes that Plaintiff's opposition briefs and declaration do *not* actually state that Plaintiff had no idea that Winclear and PC Optimizer delete computer data.  Plaintiff's statements in this regard are far more equivocal.

programs deleted data is even more implausible.  Plaintiff testified he took basic computer classes while enrolled in college; after college he had training on "[b]asic programming of multiple different programs, SAP, CMMS," and indicated he could "spend an hour talking about computerized training."  (Olney Depo., Doc. 158-6, p. 15:2-25.)  Plaintiff explained that SAP and CMMS programs were used by companies to manage finances and goods, as well as track work orders.  (Olney Depo., Doc. 158-6, 16:13-19.)  Plaintiff also testified he received computer training on internal software programs while employed with Frito Lay.  This testimony demonstrates Plaintiff had sufficient computer training to understand and appreciate the nature of Winclear and Optimizer Pro, especially since he purchased, installed, and ran the programs for years on his personal computer.

Moreover, Plaintiff took no steps to uninstall these programs after his deposition or after the Court ordered him to produce his computer.  In the face of direct commands to preserve his computer data for purposes of the litigation, Plaintiff failed to take any steps to ascertain whether the programs would jeopardize his preservation duties, and instead continued to allow the programs to run and delete data.  Even if Plaintiff did not manually initiate the deletions on his computer between January 10, 2014, and January 17, 2014, he is indisputably responsible for the installation of those programs on his computer and allowing them to delete data despite the following:  (1) an admonition from opposing counsel, (2) a production request for his computer data, and (3) a court-order requiring that he produce the computer.  And, while Plaintiff argues the Court's January 10, 2014, order to produce his computer to a neutral expert does not expressly *require* him not to use his computer, his duty to preserve the evidence on his computer is implicit. A party's duty to preserve evidence is not necessarily triggered by an express court order or a discovery request – it is triggered by some notice that the information is relevant to a potential claim.  *See Wm. T. Thompson Co. v. Gen. Nutrition Corp.,* 593 F. Supp. 1443, 1455 (C.D. Cal. 1987).  Notwithstanding that the duty to preserve the computer data was triggered long before Plaintiff's deposition, by January 10, 2014, the computer data was the subject of an outstanding discovery request *and* the subject of discovery production order.  Plaintiff's duty to preserve the computer data by January 10, 2014, was unquestionable.  Yet, even on the day it was to be

1   produced, Plaintiff allowed over 2,000 files to be deleted from his computer.

2   Because fragments of files from 2012 and 2013 have been recovered by Defendants'
3   experts, it is not foregone that all potentially relevant evidence that Defendants seek was
4   necessarily deleted by January 10, 2014, or at any particular time after PC Optimizer was installed.
5   As Defendants note, it is clear that at least some file fragments escaped deletion; there is simply no
6   way to know the extent of what was deleted and when.

7   Plaintiff's *negligence* in installing PC Optimizer in November 2012 after the duty to
8   preserve was triggered in August 2012 grew to *gross negligence* by allowing the program to run
9   on his computer after he was expressly admonished to save his computer data at his October 2013
10  deposition.  On January 10, 2014, the Court ordered Plaintiff to turn over his computer to a neutral
11  expert, and yet Plaintiff continued to allow PC Optimizer to delete data on his computer until the
12  very day the computer was produced.   This conduct was not only *deliberate and willful*
13  disobedience of a court order, it was also *willful and deliberate spoliation of evidence*.  If Plaintiff
14  was able to research,[8] purchase, install, and run the program on his computer, he was most
15  certainly able to uninstall PC Optimizer.  Instead of preserving data on his computer, Plaintiff did
16  absolutely nothing and in doing so, deliberately and willfully allowed the destruction of
17  potentially relevant evidence on his computer.

18  Plaintiff also contends that BCT deleted data after the computer was turned over by
19  Plaintiff, calling into question the entire mirror imaging process.  In light of the date anomalies
20  noted by GDF, there is little evidence that anything was deleted by BCT in the imaging process.
21  Moreover, there is no dispute that Plaintiff purchased a deletion program, installed it while the
22  litigation was pending, and deliberately allowed it to continue to run up until the day it was
23  required to be turned over to BCT.  No deletions by BCT ameliorate Plaintiff's conduct with
24  regard to PC Optimizer, nor is there sufficient evidence of deletion by BCT such that the entire
25  mirror imaging process is suspect.

26  *///*

---

27
28  [8] Plaintiff states in his declaration that after his Winclear program expired, he "began researching online for other software programs that could help [him] enhance the performance of [his] computer."  (Doc. 164-10, Olney Decl., ¶ 19.)

1          **d.     Prejudice to Defendants**

2          Defendants argue they were irreparably prejudiced by the deletions.   "The prejudice

3    inquiry 'looks to whether the [spoliating party's] actions impaired [the non-spoiling party's] ability

4    to go to trial or threatened to interfere with the rightful decision of the case.'"   *Leon*, 464 F.3d at

5    959 (quoting *Kahaluu Constr. Co.*, 857 F.2d at 604.)   "In the Ninth Circuit, spoliation of evidence

6    raises a presumption that the destroyed evidence goes to the merits of the case, and further, that

7    such evidence was adverse to the party that destroyed it."   *Dong Ah Tire & Rubber Co., Ltd. v.*

8    *Glasforms, Inc.*, No. C 06-3359 JF, 2009 WL 1949124, at *10 (N.D. Cal. July 2, 2009) (citing

9    *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982)).   If

10   spoliation is shown, the burden of proof logically shifts to the guilty party to show that no

11   prejudice resulted from the spoliation because that party is in a much better position to show what

12   was destroyed and should not be able to benefit from its wrongdoing.   *Hynix Semiconductor, Inc.*

13   *v. Rambus Inc.*, 591 F. Supp.2d 1038, 1060 (N.D. Cal. 2006), *rev'd on other grounds*, 645 F.3d

14   1336, 1344-47 (Fed. Cir. 2011).

15         Defendants contend that a remaining factual issue in the litigation is whether Plaintiff

16   consented to receive calls about educational opportunities from Defendants.   Some of the

17   recovered data on Plaintiff's computer indicates he visited the University of Alabama website in

18   November 2012 and in December 2013 to obtain information about a training certification.

19   Evidence showing Plaintiff was searching for educational opportunities is relevant to the issue of

20   the nature of the calls to which Plaintiff consented.   Because Plaintiff destroyed his computer data,

21   Defendants have been deprived of the complete scope of his website searches about educational

22   opportunities.

23         Plaintiff's declaration in support of his opposition to Job.com's motion for summary

24   judgment states he has no recollection of visiting Job.com's website, but some of the recovered

25   data on Plaintiff's computer indicate he viewed a job posting on Job.com's website in July 2012.

26   Had Plaintiff not destroyed his computer data, Defendants would have been able to investigate the

27   extent of Plaintiff's contact with Job.com's website, including the pages he viewed and whether he

28   visited pages that included the opt-out box regarding calls about educational opportunities.

Moreover, this evidence would also be relevant for purposes of impeachment.  This data was contained exclusively on Plaintiff's computer – Job.com has no record of Plaintiff's contact with its website absent some interaction with the site that would generate and submit a form to Job.com.

Other websites Plaintiff visited are also relevant because they may have similar consent procedures to Job.com or offer registered users a similar opportunity to receive calls about educational opportunities.   If Plaintiff visited these websites, such evidence may be circumstantially relevant to the scope of Plaintiff's consent to be contacted when he interacted with Job.com through Resume-Now.  While Plaintiff argues none of this evidence can possibly be relevant to show his prior express consent under the TCPA, this contention is a dispute over the merits of Defendants' defense, not a basis to preclude discovery of evidence relevant to Defendants' chosen defense.

Plaintiff's deletion of his computer data has prejudiced Defendants' ability to present a full defense on the scope-of-consent issue, and threatens to interfere with the rightful decision of the case. *See Leon*, 464 F.3d at 959 (prejudice hinges on whether spoliation impaired the other party's "ability to go to trial or threatened to interfere with the rightful decision of the case").  Plaintiff argues that its expert has indicated it may be possible to recover some of the deleted files, and contends the only reasonable sanction, if one is warranted at all, is to require Plaintiff to pay for the recovery of any relevant files that may be deleted.  This, however, does not cure the prejudice suffered by Defendants.  Even if some data can be recovered, there is no way to know whether all of it was recovered; similarly, it would remain a mystery whether unrecovered files ever existed or whether the files simply could not be recovered.  Such a recovery effort does not guarantee recovery of *all* files, and does not cure the harm to Defendants.

###      e.      An Adverse Inference is an Appropriate Sanction

As Plaintiff's culpability and Defendants' degree of harm is high, an adverse inference is warranted.  An adverse inference jury instruction is a less-harsh sanction that dismissal and because it can adequately address Defendants' harm, it is an appropriate sanction.

The adverse instruction itself can take many forms, which can range in degree of

harshness.  *See generally Pension Comm.,* 685 F. Supp. 2d at 470 (S.D.N.Y. 2010).  In *Pension Committee*, the court explained that at its harshest, where a party has acted with bad faith, the jury may be instructed that certain facts are deemed admitted and must be accepted as true.  Where a party has spoliated evidence willfully or recklessly, a court may impose a mandatory presumption which can be rebutted.  The least harsh instruction permits – but does not require – the jury to presume lost evidence is both relevant and favorable to the innocent party.

As discussed above, Plaintiff's degree of culpability grew during the course of the litigation and his failure to preserve data in the face of pending discovery requests and a court order to produce data was willful and deliberate.  Because there is no way to ensure that the full extent of the destroyed computer data can be recovered or obtained from another source, only a strongly worded jury inference will adequately address the harm to Defendants.  A rebuttable presumption inference will not address evidence Plaintiff chooses to introduce to attempt to rebut the presumption – leaving Defendants in the same position and without the evidence they need to adequately present their scope-of-consent defense.  *See Leon*, 464 F.3d at 960 (affirming district court's finding that fashioning a jury instruction creating a presumption in favor of the non-spoliating party would leave that party equally helpless to rebut any material that the spoliating party may use to overcome the presumption).  The Court orders the jury be instructed as follows:

> Plaintiff has failed to prevent the destruction of relevant evidence for Defendants' use in this litigation.  This is known as the "spoliation of evidence."
>
> I instruct you, as a matter of law, that Plaintiff failed to preserve evidence after his duty to preserve arose.  This failure resulted from his failure to perform his discovery obligations.
>
> You shall presume that Defendants have met their burden of proving the following two elements by a preponderance of the evidence: *first,* that *relevant* evidence was destroyed by Plaintiff after the duty to preserve arose.  Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and *second,* the lost evidence was favorable to Defendants.
>
> Whether this finding is important to you in reaching a verdict in this case is for you

to decide.[9]

## C.     Monetary Sanctions Are Warranted

As Plaintiff spoliated evidence both prior to the Court's January 10, 2014, order and after the Court's January 10, 2014, order, the Court is empowered to order monetary sanctions under both its inherent powers as well under Rule 37(b)(2)(C).   Plaintiff willfully and deliberately allowed the destruction of computer data on his computer after the Court ordered that it be produced to a neutral expert.   Monetary sanctions are warranted under Rule 37(b)(2)(C).

Both Defendants are entitled to their reasonable attorney fees.   While Windy City submitted the fees and costs it incurred in filing its motion for sanctions, Job.com requests that it be permitted to file declarations to support its request for attorneys' fees and costs.

## V.    CONCLUSION AND ORDER

Plaintiff spoliated relevant data on his computer after the duty to preserve had been triggered, and he did so with a culpable state of mind.   In considering the appropriate sanction, the Court finds Plaintiff acted willfully and deliberately, Defendants were severely prejudiced, and only a strongly worded adverse inference will cure the harm suffered.

Accordingly, IT IS HEREBY ORDERED that:

1.      Defendants' motion for a spoliation sanction of dismissal is DENIED;

2.      Defendants' alternative motion for a spoliation sanction in the form of an adverse
         jury inference is GRANTED;

3.      The following adverse inference jury instruction shall be given to the jury:

Plaintiff has failed to prevent the destruction of relevant evidence for Defendants' use in this litigation.  This is known as the "spoliation of evidence."

I instruct you, as a matter of law, that Plaintiff failed to preserve evidence after his duty to preserve arose.   This failure resulted from his failure to perform his discovery obligations.

You shall presume that Defendants have met their burden of proving the following

---

[9] This instruction is modeled after that crafted by U.S. Magistrate Judge Grewal in *Apple, Inc.*, 881 F. Supp. 2d at 1151.  The district court modified this instruction upon review.  *Apple II*, 888 F. Supp. 2d 976, 1000 (N.D. Cal. 2012).  Here, because of the unrecoverable nature of Plaintiff's complete computer data, this strongly worded inference is necessary to cure the harm suffered by Defendants.  A rebuttable presumption would not fully address Defendants' harm and would leave them in much the same position for purposes of presenting evidence at trial.

two elements by a preponderance of the evidence: *first,* that *relevant* evidence was destroyed by Plaintiff after the duty to preserve arose. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and *second,* the lost evidence was favorable to Defendants.

Whether this finding is important to you in reaching a verdict in this case is for you to decide.

4.     Defendants' request for monetary sanctions is also GRANTED, and the parties shall submit their billing statements and cost statements in support of their request within 20 days from the date of this order.

IT IS SO ORDERED.

Dated:   **October 24, 2014**                        **/s/ Sheila K. Oberto**
                                                              UNITED STATES MAGISTRATE JUDGE

35